Good morning all. Our first case for argument this morning is JMB Manufacturing v. Harrison Manufacturing. Mr. Tomlinson. Thank you, Judge. May it please the Court. My name is Michael Tomlinson, and I represent the appellants and cross-appellees in this case, JMB Manufacturing, Inc., DBA Summit Forest Products Company, and Ronald Bienes. This is a commercial case arising out of a contract between two sophisticated parties, Summit Forest and Childcraft. The case arises from nonconforming goods that were delivered pursuant to the parties' contract. That contract contained a negotiated allocation of risk between the parties with respect to what would happen if nonconforming goods were supplied, namely that there would be a cost of rework applied and for which Summit Forest would be responsible. But the District Court here entered a $2.8 million judgment against Mr. Bienes individually, jointly and severally with Summit Forest, for negligent misrepresentation, not on the contract. This decision has allowed Childcraft to circumvent the parties' negotiated allocation of risk here, but it's also done something else that the parties never anticipated and never contracted for, and that is that it made Mr. Bienes the personal guarantor not only of Summit Forest's contract liabilities, but also for all of Childcraft's business risk in this transaction. For that reason, the Court should reverse the District Court's judgment with respect to negligent misrepresentation and vacate that judgment amount, remanding it with direction to enter a judgment of zero because there were no out-of-pocket damages adduced at trial. Mr. Tomlinson, what was the total contract price for the goods at issue, the ones that were delivered or at least shipped without conforming to the moisture requirements? That's a fair question and anticipates a point I was going to make, which is the total amount of goods that were shipped under this contract were about $90,000. What Childcraft is seeking here today is about 10, if you include the punitives, they're looking to get $10 million and the loss of their entire business. Was there any separate contract between Childcraft and Mr. Bienes? No, there was no separate contract directly between them. No fee for advice? No, what Childcraft was paying Summit Forest for was delivering goods. There was, however, a connection, obviously, between Mr. Bienes and Summit Forest and we see cases such as the library case that talks about a network of contracts. Here, it would have been very easy for Childcraft if the Vogt Line was so important to it, was so vital to it, it would have been very easy for Childcraft to go to Mr. Bienes and ask him to personally guarantee the contract or to sign the contract individually. But it didn't do, it did neither one of those things. First, I would like to talk about, let me go back for a second, though, because we believe that in this case the economic loss doctrine is a viable means of negating the negligent misrepresentation claim. In addition, Childcraft was limited to recovering its out-of-pocket damages and the negligent misrepresentation claim could lie here. And third, the court should reverse the district court's ruling with respect to negligent misrepresentation because Childcraft's claim was insufficient as a matter of law and it's unsupported by the evidence. Also on appeal today is the district court's abuse of discretion when it failed to reinstate Summit Forest's claims against Childcraft after Summit Forest was unrepresented for a very brief period of time before trial. And as is in the briefs, there was a very narrow window between the time that the district court allowed Mr. Bienes' counsel or Summit's counsel to withdraw and the time he was allowed to get new counsel and then the time that trial was set. But the district court nevertheless refused to reinstate the claims when Mr. Bienes finally did get counsel and they also refused to vacate the default judgment against Summit Forest that it had entered a few days earlier, about a week earlier on the claims by Childcraft against Summit Forest. That was all happening right on the eve of trial, right? That's correct. It's frankly pretty hard to see an abuse of discretion there. Well, in terms of the abuse of discretion here, what happened is there was a summary judgment ruling that came down on April 10th of 2013. Shortly thereafter, Mr. Bienes' counsel moved to withdraw. That was at the end of April. He moved to withdraw. He wasn't actually allowed to withdraw until May 14th. The judge only gave Mr. Bienes about two weeks to get new counsel for a trial that was supposed to start on June 10th. He told the court, he reported to the court twice, once on May 20th and once on May 28th at pretrial conferences of his efforts. But he had trouble getting counsel to come into the case because, as the district court acknowledged, this was such a complex case. So that was the difficulty that he faced here, but he actually did get counsel. And then when he did get counsel, the court still refused to reinstate the claims and the court had only entered that judgment, which was supposed to be without prejudice with respect to the default against the claims against Summit. So . . . Mr. Tomlinson, can I ask you, at least one of the ironies in this case is, if I recall correctly, your clients brought the case originally, right? That's correct. And sought to pierce the corporate veil of child craft? That's right. On what theory? The theory was that, based on some of the things that we've discussed in our briefs, which is exactly the amount of capitalization that child craft had originally, must not have been adequate because it burned through the cash in a short period of time. Now, that's despite the fact that . . . That doesn't seem a whole lot more unusual than delivering nonconforming goods under a regular commercial contract. In terms of piercing a corporate veil? Yeah. But the point, with respect to the negligent misrepresentation claim, is that child craft's not seeking to pierce the corporate veil. They're seeking to have a direct action against Mr. Bienes for individual liability. In terms of the piercing of the corporate veil issue, that was never able to be litigated in the lower court through a trial because of the default judgment and because of the claims that were dismissed with prejudice. They had the effect of being dismissed with prejudice. With respect to the negligent misrepresentation claim, the first reason that the court should reverse the district court on that particular claim is that the economic loss rule bars the negligent misrepresentation claims here. As I already said, there is a contract at issue here. These were commercial parties. The negligent misrepresentation claim does nothing more than seek to make Mr. Bienes a guarantor of those contractual liabilities. The Indiana Supreme Court, in the Greg Allen case, also has stated that it refuses to impose tort liability on a corporate officer and employee in the negligent performance of a contract. And that's really what's at the heart of this. Child craft has argued that they're not claiming a negligent performance of a contract. But Mr. Bienes was an officer and an employee of Summit Forest. The contract was with Summit Forest. If he committed negligence in carrying out that contract, then absolutely this is a claim for negligently performing the contract. And because of that, under cases such as Greg Allen, this court and the district court should not have imposed liability upon Mr. Bienes individually. If the plaintiff had tried to and succeeded in proving intentional fraud, misrepresentation of a present existing fact, for example, deliberately, would there be a more solid foundation for holding Mr. Bienes personally liable? If that had happened, which it was not done in this case, but if it had happened, then there may be an argument that he went outside of his duties as a corporate officer. And that's an entirely different question. That's an entirely different question, yes. Second, the economic loss rule applies here because there are no special circumstances that would negate its application here. And I'm not going to go through everything that we put in our briefs on this, but I do want to highlight one point that bears note here. In cases such as the U.S. Bank case where there was a title company that prepared a title and they missed the foreclosure judgment, what is going on with the title company is they are trying to prepare information for the bank to use in its transaction with a third party, its mortgagor. In cases where we have a surveyor, another category of persons who have been held liable for negligent misrepresentation, notwithstanding the economic loss rule, the survey is being prepared for the purposes of the recipient to use that survey in its transactions with third parties. Mr. Bienes didn't do that here. The information he was providing to Child Crack was with respect to their contract with each other and the performance of that contract and in an effort to try to deliver conforming goods. This was not a case where Mr. Bienes was delivering information to a recipient so that they could rely on it in their transactions with third parties. And for that reason, there's no special circumstances here, such as in the U.S. Bank case and similar cases, that would bear negating the economic loss rule here. Mr. Tomlinson, would it be accurate to describe some of the Indiana exceptions that have been recognized to the economic loss rule to situations where persons were acting, oh, I guess I would say something like advisors to a transaction. That is where I think that would describe the title company or the surveyor in a real estate transaction where there may be a fee being paid by one party to the transaction, but the information is essential to all the parties. And as a matter of economics, the costs are going to be shared among all the parties. I think that is accurate, and I think it's worth noting that although there are some statements in the Indiana law that negligent misstatement is an exception to the economic loss rule, what the courts have done in actuality is they've looked at every negligent misrepresentation claim on a case-by-case basis. And in the cases such as the ones that you described, Your Honor, they have found that a negligent misrepresentation claim can go forward despite the economic loss rule. But in cases such as the library case and, as we say, this case here before the Court today, the economic loss rule should still bar the negligent misrepresentation claim here. There are no such special circumstances in this case. In addition, Indiana public policy, and I've alluded to this before, also favors application of the economic loss rule here. And specifically, Indiana courts have said that the economic loss rule protects commercial parties' freedom to allocate their risk among themselves. Mr. Bienes, again, was an employee and officer of Summit Forest. Childcraft contracted with Summit Forest for the delivery of goods, and that's what they were paying for. They weren't paying Mr. Bienes separately for his advice, and they weren't paying Summit Forest separately for their advice, for its advice. However, even if a negligent misrepresentation claim could withstand the economic loss rule here, it could be seen as an exception to the economic loss rule. I'm sorry, Mr. Thomas. Before you move on from that, I guess, the district court here seems to have put great emphasis on the use of the word broker. I wonder if you could address that issue. I can. I can. There was a case of Jeffrey v. Methodist Hospital that included or lumped in brokers as people who have been held liable for negligent misrepresentation. I did a little research on that. And there's a case, I finally found the case that the parties were discussing. It's a 1923 case in Indiana. And I apologize. I left the piece of paper I had to cite for at my house. This is the case that you think that the Court of Appeals and Jeffreys was referring to without citing it? I know it is. And I'll tell you why. Because when you shepherdize the case, it comes up with the briefs from the Jeffrey case as having been the cases, the only ones that cite that case. Ah, okay. So, anyway, if you read that case, you're going to have a fun time of it because it's very difficult to quite understand exactly what the Court was judging. It's written in some archaic English. It's very difficult to understand exactly what the Court based its decision on, whether it was a negligent misstatement in that case or just a failure to, some other type of failure. Now, even if, so, in addressing the question about the broker, the broker is a legal status. And I believe that the district court placed emphasis on that because it had been lumped in in at least one other case as a particular type of person that could possibly be held liable for negligent misrepresentation. But the district court was inconsistent in its application of the title broker to Mr. Bienes and to Summit Forest. It also, in other parts of its opinion, referred to them as a supplier. And because of that, I don't think that any special significance can be placed on the fact that the district court, at times, referred to Mr. Bienes and Summit Forest as a broker. And even if we, even if they did, it would be improper here because, as we've already discussed, they didn't get paid as a broker. Summit Forest didn't get paid as a broker. He got paid for delivering conforming goods here. Or not paid. What's that? Or not paid. Or not paid. Correct. Or delivering nonconforming goods. Correct. So even if we look at one other point on the broker issue, even Childcraft did not view Mr. Bienes as a broker. In fact, in a trial, Mr. Guestford, the CEO of Childcraft, argued with his own counsel about what they, when his counsel called Mr. Bienes a broker and said, well, you say it's a broker, we would view them as a supplier. So the district court's emphasis on broker, I think, is misplaced here and I do not think should be a significant factor in determining whether the negligent misrepresentation claim stands. However, even if a negligent misrepresentation claim were to stand in this case, Childcraft can only recover its out-of-pocket damages. As this court addressed in Tricco v. Hubbell, the Section 552B of the restatement applies to supply the proper measure of damages here. And those are out-of-pocket damages, not expectancy damages and not benefit-of-the-bargain damages. Contrary to this rule and in reliance on the expert witness report of Mr. Parks, which he was Childcraft's expert witness, the district court here found that Mr. Parks' report concluded that because Childcraft did not receive useful products from Summit, Childcraft was unable to fulfill orders from its customers for the boat line and it suffered lost sales. Those lost sales caused by the failure of Summit directly led to the complete loss of Childcraft's business in June of 2009. But what we're talking about are expectancy damages. These two parties had a contract and they had a contract for delivery of goods and conforming goods admittedly. But the expectancy from that contract was that there would be profits and that there would be sales. These are expectancy damages in the true sense of the word. There are cases where it's difficult to determine whether it's an expectancy damage or reliance damage. I'm the first to admit it. But this is not one of them. The damages that are here in this case were based off of Mr. Parks' report. Mr. Parks' report says nothing about negligent misrepresentations or that those were the cause of any damages. What it says is that the damages flowed from lost sales and that those ultimately led to the demise of Childcraft. In our opinion, that's fairly attenuated. And in any event, as we discussed before, that's far out of line with a $90,000 contract. And I want to address one other point briefly because it was raised in Childcraft's briefs, which is the issue of waiver. This particular issue of Section 552B being the correct measure of damages was raised for the first time by the District Court itself. Not by the parties, but by the District Court itself in its entry on damages. The District Court had full discretion and, in fact, an obligation to make sure that it was applying the correct law here to come to a result that was correct with respect to damages. And that's what it did. The issue was not waived. And even if there could be an argument of waiver, the District Court had an obligation to correct this misapplication of the manner of damages here, of the method of damages. We also contend on appeal here today that the negligent misrepresentation claim here was insufficient as a matter of law. The primary issue here is whether there was any reliance on the statements that the District Court looked at in its opinion. We need to first, though, look at some of the statements that the District Court did not seem to account for in its opinion. On November 3, 2008, there was an email from Mr. Bienes. Now, this is at the beginning of the parties' relationship. There was an email from Mr. Bienes to Mr. Suvac, the COO at Childcraft, where Mr. Bienes expressed doubt about PTCDA. Specifically, he predicted delayed shipments, and he also predicted that PTC, or saw that PTCDA did not seem to be wanting Summit Forest or Childcraft's business. In response to that, Mr. Suvac stated on the same day that he wanted to salvage the relationship with PTCDA nonetheless. And that's found in our appendix. Both of those things are found in our appendix at 52 to 53. Two days later, Mr. Bienes again emailed Childcraft about PTCDA and said, please advise me about whether you want to go forward with PTCDA. And he listed issues relating to pricing and issues, again, relating to delivery. That's in our appendix at 50 to 51. Mr. Suvac again responded that he did not want to, quote, jump next door to a new supplier. He said that, quote, my goal is to stay with PTCDA and find a solution with them, end quote. So we see that Childcraft was not relying on Mr. Bienes as an advisor here. They were the ones running the ship. They were the ones deciding whether to stay with PTCDA, and there was a very important reason that's been alluded to in the briefs. PTCDA was essential to the Made in the USA program that Childcraft was relying on. And if they had gone to even the other supplier in Vietnam that they were looking to go to, that would have completely negated that program. Why would that be, Mr. Tomlinson? Wasn't the Made in America the fact that it would be assembled here? It was dealing with the fact that it would also be assembled, not only assembled, but finished. And the Vietnamese vendor was going to finish the products in Vietnam. So, as far as I understand it, the difference is that assembly would always occur here. That's right. Yeah, but that, the fact that one is finished versus unfinished. There would have been some assembly still here is my understanding. But the issue is that the real, what it boils down to is that Childcraft viewed going to the Vietnam supplier as negating its Made in the USA plan. So, it knew that if it went to the Vietnam supplier, that would severely inhibit its plan that it had for revitalization. I see that I'm running into my rebuttal time, and I will reserve the rest of that time. Thank you. Thank you, Mr. Tomlinson. Meredith. May it please the Court. Opposing counsel. My name is Chad Meredith, and I represent the Appellees and the Cross Appellant in this case. Your Honors, after more than three years of intense litigation, including a bench trial on liability and a bench trial on damages, the District Court in this case entered final judgment in favor of my client after having previously issued detailed and well-reasoned findings of fact and conclusions of law in which it found that Mr. Ronald Bienes had committed negligent misrepresentations that my client, Childcraft, justifiably and detrimentally relied upon. Your Honors, the District Court found everything right in this case with two exceptions, and those exceptions are these. First, it entered damages in favor of my client to the tune of approximately $2.7 million, even though it expressly found that my client had suffered in excess of $5 million in losses due to its justifiable reliance on Mr. Bienes's misrepresentations. And secondly, Your Honor, the District Court erred in denying our claim for punitive damages. Your Honors, I'm going to address the things the District Court did right here today because Mr. Bienes takes issue with a lot of those things, but first, I'd like to address the two errors that it made. Your Honors, the first error the District Court made was its award of compensatory damages. And to help us understand this, I think we need to take a step back and look at the procedural posture, the procedural history of this case. The original final judgment was entered in April of 2014, roughly a year ago today, that my client suffered in excess of $4 million. Now, shortly after that, Mr. Bienes's third set of lawyers made an appearance and they filed a Rule 59e motion arguing that there shouldn't be any damages because the entire measure of damages my client was seeking was barred by Section 552b of the restatement. The District Court took that under consideration and partially agreed with it and cut our damages down to $2.7 million, even though it expressly found in its entry that my client had suffered in excess of $5 million in losses. Now, Your Honors, the issue here is that Mr. Bienes's argument as to damages was never raised prior to their Rule 59e motion. Mr. Meredith, the district judge usually is given considerable leeway in excusing arguable waivers so that the right result can be reached. Was it an abuse of discretion for the district judge to excuse that arguable waiver? It was, Your Honor, but that brings up a very interesting point. I believe the standard of review here should be de novo because I believe I know my... When a district judge basically exercises discretion in deciding whether issues have been presented sufficiently and in a timely way, you think we ought to review those questions de novo? I think so, Your Honor, because my interpretation of the case law says that when you review a finding of waiver or non-waiver, the facts upon which that finding are based are reviewed for clear error and whether those findings themselves constitute waiver is reviewed de novo. But I think regardless, Your Honor, I believe it is an abuse of discretion here because the rule in this circuit, as I understand it, is and always has been that if an issue is raised for the very first time following final judgment, it's waived. That's the rule if the district judge decides not to excuse it. Your Honor, I believe in this case the district judge should have found waiver because this is an issue, Your Honor, that could have been raised prior to final judgment and frankly, Your Honor, not raising this issue prior to final judgment has prejudiced my client. The issue on damages was primarily about our damages expert's testimony. Had this issue been raised prior to final judgment, which it could have been, our damages expert was deposed and gave his report in, I believe, the fall of 2012, well before the liability trial, a year and a half approximately before the damages trial. The basis on which his testimony, the basis for his testimony was well known by everyone. This issue clearly could have been raised prior to final judgment. But because it wasn't, Mr. Bienes' counsel were able to misconstrue his testimony and cast it in a light to make it look like he was testifying to an impermissible measure of damages. Had they raised this issue prior to final judgment, we could have supplemented the record. We could have asked our damages expert to clarify what he was talking about. But they didn't do that. They waited until after final judgment, after the proof was closed, and we were hamstrung. We were stuck with the record we had. At that point... Did you make that argument to the district court that we need to reopen the evidence here? We did not ask the district court to reopen the evidence, Your Honor. At that point, at that point we felt strongly there was a waiver and we did not do that. Your Honor, finality has to mean something. When... Mr. Meredith, could I ask you, could we go to what at least I view as the heart of this case, which is whether negligent misrepresentation can apply at all here? Yes, Your Honor. Absolutely. And you're talking about the economic loss doctrine, I take it. I am. And specifically, what in your view was the source of Mr. Benious' duty? Your Honor, the source of his duty was this. He was not under any contractual obligation to make representations about the nature or the quality of the goods or the nature and quality of the inspections. He undertook that duty himself. He... As an employee and owner of the party you contracted with, right? He didn't have any special individual role, did he? I'm not sure I would agree with that. Well, I think that... I think it is literally true that he was an owner and employee of Summit Forest Products. But I think that I would say that he made those misrepresentations as a trusted advisor to Childcraft. They were... Was he paid for those services? Childcraft was not paying Mr. Benious for his advice. They were paying Summit... I'm trying to imagine, Mr. Meredith, a situation in which, for example, a merchant who sells a particular kind of goods, in this case, components of furniture, isn't more... probably a little more knowledgeable about his products than his buyer is. Isn't that pretty common? Well, that's exactly right, Your Honor. I think... But I think that weighs in favor of not applying the economic loss doctrine here because I think Mr. Benious had superior knowledge as to what was going on and my client was relying upon him for that, particularly... for any facilities or any employees in Indonesia. Mr. Benious was the only person who had direct contact with the supplier in Indonesia. He had... He had inspectors on the ground in Indonesia. My client was relying upon... upon Mr. Benious. Relying upon Mr. Benious to supply... well, to Summit to supply conforming goods, right? Let me... Let me try this a different way, Mr. Meredith. If the goods had conformed to the contract specifications, would your client have a claim against Mr. Benious? That's... That's a very good question, Your Honor, and I actually... I thought I might get that question today and I think the answer is... Well, we don't precisely know what would have happened had they done that, but I think they would, Your Honor. On what conceivable basis? I think conceivably we could say... One could say that... We've got to keep in mind the facts here. On February 4th, Mr. Benious emailed my client and said, you know, six to eight percent, we're good to go. Assume Summit complies with the contract. The shipments are on time, as promised, and the goods are within spec. Is there any conceivable claim against Mr. Benious under your theory? So we're assuming that everything was as it should have been? Mm-hmm. If everything is as it should have been, then I think there would have been no negligence on Mr. Benious's part in any of his misrepresentation or any... Right. I think there would have been no misrepresentations. It's only the breach of contract that provides the foundation for any claim against him. Well, if everything is as it should have been, I don't think there would have been a breach of contract or any claims at all, but maybe I'm misunderstanding your question, Your Honor. Let me explain to you my concern here, Mr. Meredith. I realize this transaction was important to Childcraft, but at least from the perspective of the law, I think this transaction is utterly routine. It's a contract to supply goods. The goods wind up not meeting the contract specifications. The supplier, upon making the delivery, claims that they do meet the contract specifications. All that sounds pretty mundane. Would you agree? I agree, Your Honor. And there's no effort here to prove intentional fraud, is there? I agree, Your Honor. Okay. So, for the last several centuries, the English and American legal system has developed a body of contract law to deal with such cases. A couple of major features of those are that the liability runs to the corporation that is the principal in the contract, not to all of its agents, and the damages are limited. But the theory that it was adopted by the district court here seems to me to invite routine departures from those rather fundamental characteristics of contract law. Unlimited consequential damages, personal liability for agents of the contracting parties. So I guess I'd like you to try to explain to us why this case is so special that we could affirm here without tearing away a good deal of contract law. Thank you, Your Honor. And here's why this case is different. Indiana law, when you step back and look at the body of law on the economic loss doctrine in Indiana, here's where Indiana draws the line. If the interest that is infringed upon is an interest in seeing contractual obligations fulfilled, then the economic loss doctrine applies and you do not have tort liability. If there is an interest outside contractual obligations being fulfilled that is also infringed upon, then you have tort liability. When you look at all the cases, that's essentially the rule of thumb. And here, Your Honor, we have an interest outside contractual obligations that was infringed upon. And that interest is this. Childcraft, in February 2009, was considering switching to an alternate supplier. Mr. Bienes made misrepresentations upon which Childcraft relied and our Chief Operating Officer, Mark Suvac, expressly testified at the liability trial that Childcraft relied on those misrepresentations in choosing not to switch suppliers. Mr. Bienes had no contractual obligation to make those statements. His company's obligation was to deliver conforming goods, goods that conformed to the contract. Had his company simply dropped the goods off at Childcraft and left and said nothing, then I think Your Honor would be right. I think that we would be limited to our contract remedies here because there was a breach of contract and the failure to deliver conforming goods is solely a breach of contract. But where this goes off the rails, where the difference is, Your Honor, is that Mr. Bienes chose to make affirmative misstatements or to make negligent misrepresentations about the facts here, about what was going on, and my client relied upon those statements and it infringed upon my client's interest in being able to make decisions about its business and about its actions based upon true rules. What exactly are you referring to as those misrepresentations? Your Honor, if you look at, on February 4th, Mr. Bienes sent, and I'll find the site for you, Your Honor, Mr. Bienes sent... App, Defendant's Appendix 12, the email from February 4th. Yes, Your Honor, Mr. Bienes says moisture content is 6 to 8 percent. He says, CETA tested moisture content on cribs in between 6 to 8 percent. I will have Maria confirm when it is time to ship. Okay? Last clause is a promise, right? Not a negligent misrepresentation. The promise... I will have Maria confirm. That's correct, Your Honor. That is... That's not actionable. I think under NALA that's correct. Okay. He reports that CETA has reported tests between 6 and 8 percent. Okay? And you're saying that was a negligent misrepresentation? Yes, Your Honor. The way we view that is there are actually two statements there. One, CETA has tested this. And two, the results of that test are 6 to 8 percent. Okay? But you're not saying he lied about it. Well... He just... I don't think there was any... any... any scienter. I don't think it was... I don't think he was committing fraud there. Okay. I don't think he was... So he was mistaken. I think it is a negligent misrepresentation because it is factually... it is factually false that those... that the moisture content of those goods was 6 to 8 percent. But he didn't know that. Well, he... But the key, Your Honor, is that he should have known that that was false because the key, Your Honor, is a mere four minutes, a mere four minutes before he sent that email, he sent another email to CETA saying, essentially, do you guys even know how to dry good... to dry wood properly? And he sent an email to his attorney later saying, CETA told me it was 6 to 8 percent, but I didn't believe them because their word's not sterling. They've been giving me bad information this whole time. They told me 6 to 8 percent, but I didn't believe them. But he didn't share any of this with my client. Yeah, he's a supplier, but what else have you got? Well, Your Honor, I think that's kind of key because, you know, with negligence, we're looking at what would a reasonably prudent person have done in this situation. He had reason to know that this 6 to 8 percent was not accurate, and yet he sent it on to my client as if that was the actual result. He said he had been told that, essentially, right? Well... He had reason to doubt it. Your Honor... What else have you got? Okay, well, Your Honor, we get to late February, and he says, in Mr. Beneson's another email, he says we've got... There are 78 cribs ready for second P.O. in cases. Right, that's right. That is what will be shipped on this container. Now, what's negligent about that? Well, my client interpreted ready as meaning they conform to the contract. Now, wouldn't you, wouldn't in any commercial setting a buyer assume that if the supplier has delivered the goods they are representing, they conform to the contract? Can't you take that for granted? Well, I think... I don't know if I agree with that, Your Honor. I think that... I think it's not always true that suppliers make representations about quality. They can say it's as is, but come on. In commercial dealings, business people who are making deliveries are implicitly asserting that this... Here are the goods we promised you. They conform to our contract. Well, again, Your Honor, I think... It would be very hard to say that's not implicit in any delivery. Your Honor, I think, again, that gets back to the point of Mr. Beneson, on his own volition, decided that he was going to make statements about the nature and quality of these goods and the nature and quality of the inspections. Saying they're ready. That's right, Your Honor. My client interpreted that to mean these goods have been inspected. Everything's good to go. We're ready. And, again, they... Now, I know my opposing counsel is going to say, well, they didn't rely upon this because Doug Guestard testified that by February 22nd, they had to make a decision about what was going to happen. Your Honor, I don't know what that... Frankly, I don't know what that means. I think it was a misstatement. February 22nd has no independent significance to anything in this case. I think Mr. Guestard made a misstatement. I think he meant another date, because February 22nd means nothing in this case. There's no significance to that date. I think he was probably meaning late February, maybe February 28th, or something of that nature. But the bottom line here, Your Honor, is that my client had an interest outside an extra-contractual interest, outside contract completely, in making decisions about its business based upon truthful information. And it did not receive truthful information from Mr. Beneson. And because of that, it decided to stick with him as its supplier rather than switch to its alternate supplier. Mr. Curtis, if Mr. Beneson was not as credentialed as he was, the record indicates, would you still be making this claim? How much are you suggesting that because you had an expertise in woodcraft that affects your assertions in this case? Well, I think you're correct that it definitely does affect it. I don't think it's dispositive. But that goes to the justifiability of my client's reliance. My client had dealt with Mr. Benes for years and knew that he had this expertise, and they trusted him. In the past, everything had gone well. They had even had a moisture content problem on goods in the past, and Mr. Benes had resolved that issue in a satisfactory manner, and everybody had gone along, everything had been great. So they assumed that, in this case, the same thing was happening. There was a moisture content issue, and they assumed when Mr. Benes said, everything has been tested, 68%, it's fine, they assumed that, once again, he had resolved the issue. And a lot of this was based upon his expertise, but also upon the trust that he had engendered in my client over the years. Back to the area, or part of the area Judge Hamilton was emphasizing. For us to depart from what appears to be maybe Indiana's approach in this area, should we rely on an individual like this rather than having a lesser education, just happen to be a good salesperson, in effect, in a prior dealing? I don't think it turns on that, Your Honor. I think it's an element, but let me say, I don't think we're asking anybody to depart from Indiana law here. I think that our position in the district court's ruling is completely in line with Indiana law. Indiana law... I'm sorry, Your Honor. Are you claiming there's some kind of fiduciary duty here? Your Honor, I don't believe there's a fiduciary duty, but I do believe that there is a tort duty. Once you choose to start speaking, if you're not contractually obligated to speak, I believe you have a duty to tell the truth, or to give full disclosure. I'm trying to imagine what the Indiana casebooks would look like if, for the last 100 or 150 years of commercial law, employees of contracting businesses were personally liable, along these lines, for errors as to facts on whether goods can form, when they're going to be shipped, and so on. Well, I think that's a good point, Your Honor, but I would disagree with you that that's what's going on here. I don't think this is a pure error in terms of a commercial error. I don't think this is a pure commercial error. I don't believe that this is simply loss caused by defective goods. There clearly were defective goods here, and that was a breach of contract, and there are losses from that. There were also misrepresentations that my client relied upon, and the damage from that stems not from the defective goods, but from my client's loss of the opportunity to switch suppliers to its alternate supplier. And were those misrepresentations anything other than those two e-mails we've talked about? Well, Your Honor, I believe, when you look back at the entire, the full panoply of communications in this instance, they started back in the fall of 2008, and Mr. Benis started saying, look, you know, everything is inspected, everything's good, and my client relied on that. Not disastrously, but in terms of specific negligent misrepresentations, those are the two e-mails you're relying on, right? Well, I think that's the critical time period. That's kind of what it hinges on, because that is the point. You know, earlier, I think they did suffer damages from their reliance on the earlier misrepresentations, because they kept ordering goods and waiting for the shipments to come, and they were losing time in which they could have been selling their goods, their wares. But the clearest cut issue is when we get to February 2009, and they're ready to switch suppliers, they're ready to go to their Vietnamese alternate, and Mr. Benis says, everything's good, it's been inspected, 6% to 8%, we're good to go, we're up and running, and my client cancels its plans to switch suppliers. Had they not done that, I don't think we would have had the loss of the... Had they switched suppliers, I don't think we'd have the loss of the company. And, Your Honor, Indiana law recognizes negligent misrepresentation as an exception to the economic loss doctrine. When you look at the U.S. Bank case, when you look at the Indianapolis Library case, they say that. They say, negligent misrepresentation is an exception to the economic loss doctrine. And now, there are exceptions to the exception. That's how I view the Indianapolis Library case. And the exceptions to the exception, when you look at all these cases, the cases where the economic loss doctrine is applied, those are cases in which the parties aren't really talking about a negligent misrepresentation. They're talking about negligent performance of a contract. Okay? That's the Greg Allen construction case and the Indianapolis Library case. And let me point out, both those cases are construction cases. And in construction cases, as the Indiana Supreme Court noted in the Indianapolis Library case, there is no industry that has a greater reliance on contract law than construction cases. So in construction cases, you have this network of contracts... Or the UCC's Article II sale of goods. Well, Your Honor, that's correct. There's no question about that. But, I would add, but, the UCC does not cover negligent misrepresentations. And that's why negligent misrepresentation is viewed as an exception to the economic loss doctrine. And I think another rule of thumb that you can see when you look at these cases is when the parties could have, should have, and normally do allocate the risk of loss on the front end through negotiations, and when that can be handled most efficiently, then you typically don't have tort liability. Okay? And that's typically the case with construction cases. That's typically the case with the risk of loss from defective goods. Okay? And we had that here. We had a negotiation about the risk of loss from defective goods. But what parties do not typically negotiate on an ex-ante basis is the risk of loss from misrepresentations. Because I think everyone in our society understands that at some level you've got to just be able to trust and rely upon trusted advisors. No one negotiates with their trusted advisors as to what's going to happen if that advisor misrepresents something to them. Because that's how one becomes a trusted advisor in the first place. They don't... It's not foreseeable that there are going to be misrepresentations. And when you look at the Indianapolis Library case and the Greg Allen case, those weren't really negligent misrepresentation cases. They said those words in the claim, but really what those cases was about is the plan of saying, hey, we did not get what we bargained for. We did not get the buildings that we contracted for. Okay? And in this case, Your Honors, there's certainly an element of my client not getting the goods that it contracted for. There's no question about that. But the other issue, but separate and apart from that, is this other issue of negligent misrepresentations. It infringed upon my client's ability to make a decision about whether to switch suppliers. And that's the real heart of the matter here. It also... And that issue really came to a head in February. But had we known back in November or December that Mr. Bienes wasn't even sure that CETA could dry wood properly, we could have switched then. It sounds, Mr. Meredith, as if you're saying that one party to a contract must share all of his nightmare insecurities about things that might go wrong with the other party. I mean, you never know for sure. He's a middleman. He's depending on CETA, right, in his business. And he doesn't know if he can trust them for sure to do a good job. He's committed his company's capital and reputation and put it at risk, but he doesn't know that for sure. Does he have to share all those insecurities with you all? I think that in this case, he had to give full disclosure about the fact that he did not know whether they could adequately dry the wood. I think he needed to give full disclosure. And where does that obligation come from? I think that obligation stems from tort law, Your Honor. I think when you choose to speak, and I think you're right, Your Honor, that you don't have to give, you don't have to tell anybody about all your full spectrum of nightmare scenarios because the reality is a lot of worst-case scenarios don't come to fruition, so I don't think you have to tell that. But when you believe that there are problems, and it's clear that he subjectively believed that. He didn't know whether they even knew how to dry the wood properly. He says in an e-mail a few days after February 4th to CETA, he says, I think you guys just winged it. I don't think you really have any process. That's all information that he should have shared with my client. And this again goes back to... Did your client have any information about the terms of the contract between CETA and Summit or about the pricing between CETA and Summit? I don't know that specifically, Your Honor. I think that they may have, but to be honest, Your Honor, I don't know for certain that they knew the exact terms. But I believe they did have information about the pricing. But I think the key is, Your Honor, once you choose to speak, you've got to be honest and open. I think Summit would have been perfectly justified in just dropping the goods off and not saying a word. And had the goods been defective, we'd have a breach of contract claim and a breach of contract claim only. What if the situation were not damaged goods? Representation was a delivery on time. Okay. Your Honor is aware that occasionally an Indonesian company is slow in... They don't deliver on time. World of tort. I think it depends on the extent of his knowledge and the strength of his reservations. I think, for instance, I think if he had knowledge that one or two instances in the past 20 years they'd been late, I don't think that makes it a tort, Your Honor, because I think this all goes to kind of the reasonableness of conduct. I think if he knew that they were late 90% of the time, I think probably that would be a tort. So I think it's kind of a sliding scale of issues. Your Honor, let me add, the Indiana courts have said that privity of contract is a critical issue, not the dispositive issue, but a critical issue in the economic loss doctrine. It's undisputed there's no contract between Mr. Bienes and my client. There's no privity. Can you point us to any comparable cases, though, where the contract was, where the defendant in the negligent misrepresentation claim is an employee or agent of the contracting party? Let me think about that for a second, Your Honor. Well, I can. The Jeffrey case, for instance, Your Honor. Well, I'm sorry, the contracting party. The contracting party, yes. The... Your Honor, off the top of my head, I'm not aware... Me either. ...of those. I'm not aware of any case to that effect. And I would think that if that's a viable claim under Indiana law, we would see it all the time. Well... Particularly any time the contracting party is judgment-proof. I think what Your Honor is getting at is is this a back doorway around piercing the corporate veil? And I don't think it is, Your Honor. And the reason why I don't believe it is is because had Mr. Bienes given full disclosure or had he chosen not to speak at all, we would not be able to put personal liability on... Your Honor, I see the red light has come on. May I finish this thought briefly? We would not be able to impose breach of contract liability upon Mr. Bienes for the contract. So, Your Honor, we respectfully ask that you reverse the district court on damages, affirm on everything else. Thank you, Your Honor. Thank you, Mr. Murray. Mr. Tomlinson? Thank you again. May it please the Court. I see that the yellow light was on. I'm going to have some very brief comments for the Court in rebuttal. When you look at the full set of communications here, what is clear is that Childcraft was not relying on Mr. Bienes or on Summit in determining whether to switch suppliers or to do anything else. They didn't heed his advice in November of 2008, as I pointed out when I was up here before. They refused to go to Indonesia at Mr. Bienes' request, not once, but twice. They wanted to see for themselves whether they got conforming goods. But they did go to Indonesia initially. They spoke with PT CETA directly about their specifications and exactly what they wanted. So PT CETA and Childcraft did have direct communication at the very beginning of the relationship. And then when Mr. Bienes started to warn them about PT CETA after that trip and then said, hey, you may want to think about going back there again because I don't think that they got it the first time or they don't seem to want our business, they refused. At the damages phase of the trial, Mr. Bienes was asked to tell the Court how much does a trip to Indonesia cost. He testified it was about $1,500. They didn't want to spend $1,500, and now they seek $10 million from my clients. That's what they're, you know, to supply conforming goods, that's what Summit Forest was contracted to do here. And when we talk about the duty that Mr. Bienes had, the fact is, if there was no contract, he had no duty. His duties and obligations were concurrent with the duties and obligations of Summit Forest, and those obligations were to supply conforming goods. Could you address this question about February 22nd versus February 28th decision point? I can't. The February 20th e-mail, there's a February 20th e-mail at our appendix 17 to 18, and that February 20th e-mail is a date when Childcraft decided to continue on with PT CETA. If you want to talk about reliance, let's look at this. PT CETA had sent three nonconforming goods, three shipments of nonconforming goods to Childcraft. Childcraft had put further shipments on hold, and then on February 20th, in the e-mail I just cited to, they decide that they want to go forward with PT CETA anyway. Regardless of what Mr. Bienes put in his e-mails, they were running the ship, they were driving the ship here when it came to switching suppliers, and they wanted that made in the USA, they wanted that made in the USA designation. One brief point about the February 4th e-mail that was sent on the same day as the February 4th e-mail that the district court relied on as a negligent misrepresentation. Mr. Bienes was not sending an e-mail to PT CETA. If you read the e-mail, what it says is, what he's asking them is, he's inquiring about their methods of drying because he thinks they're drying too slow. He's thinking, they're talking about, not whether they can get the job done, but how quickly they're getting the job done. That's what he's inquiring about. So there's no inconsistency or incongruency between the February 4th e-mail that he sent to Childcraft and the February 4th e-mail that he received or sent to PT CETA regarding their drying methods. And just a final point today, and that is, if this type of liability is allowed, and the court's touched on this several times today, it's not only going to radically change the way that parties arrange their contractual relationships with each other, but it severely negates the type of limit... the reason why people form limited liabilities entities in the first place. If there can be this type of liability in this case, it'll dampen that public policy as well, which allows parties to form corporations to limit their personal liability. Thank you. Thank you, Mr. Fallin. Thanks to all counsel. The case is taken under advisement.